MARION F. EDWARDS, Judge.
 

 | gDefendant/appellant, Derrick Holt (“Holt”), appeals his conviction on two counts of second degree murder committed on September 6, 2003, violations of La. R.S. 14:30.1. For the reasons that follow, we affirm.
 

 Following his indictment for the murders, Holt filed a Motion to Appoint a Sanity Commission to Determine Competency to Stand Trial. The trial court ordered that a sanity commission be appointed to determine his competency to stand trial and to determine his I.Q., i.e., his level of mental retardation. Subsequently, after a sanity hearing, the trial court found that Holt was mildly mentally retarded but competent to stand trial. Two omnibus motions, including a Motion to Suppress, as well as Motion to Quash the Indictment as Constitutionally Deficient were denied. After a two-day trial, a twelve-person jury found the Holt guilty as charged, on both counts. A Motion for New Trial was filed, which the trial court denied, and, after sentencing delays were waived, the trial court sentenced Holt to life at hard labor without benefit of parole, probation, or | ^suspension of sentence on each count with the sentences to be served consecutively.
 

 On appeal, Holt argues that the trial court erred in failing to give his requested
 
 *504
 
 jury charges
 
 on
 
 self-defense and in giving the jury an improper jury charge on reasonable doubt; he further argues that the erroneous jury instructions were not harmless error.
 

 TRIAL PROCEEDINGS
 

 Detective Nick Vega (“Detective Vega”) with the Jefferson Parish Sheriffs Office testified that, on September 6, 2003, at approximately 8:00 p.m., he assisted in responding to 911 hang up calls at 2037 Tuskegee Drive, in Marrero, Louisiana. Upon arrival, he saw a naked female, later identified as Narcissa Laymon (“Lay-mon”), lying face down half in the doorway. The door was ajar with the woman butted against it. As he approached the woman, he saw blood inside the doorway and into the living room. He called for medical assistance after he observed that the woman was struggling to breathe and had stab wound injuries to her back with blood seeping out.
 

 Detective Vega also noticed another victim, a male later identified as L.C. Lewis (“Lewis”), who was located at the house next door, on the sidewalk by the driveway. The victim’s eyes were open; however, he was unresponsive. Detective Vega observed a “slit” in the male victim’s chest. Later in his investigation, Detective Vega interviewed the next-door neighbor who called the police, and then he searched the area for the suspect.
 

 Ronald Jacks (“Jacks”) testified that, on the date of the incident, he drove to his mother’s home, which is next door to the crime scene. A neighbor of his mother’s, whom he identified as Holt, approached him and calmly asked for a big screwdriver because he had locked the children in the house. Jacks had seen Holt |4taking the children, who lived at 2037 Tuskegee, to school several times over a three-month period. Jacks offered Holt a small screwdriver and also offered to help him get into the house, but Holt declined. Jacks testified that he left Holt by the front window at 2037 Tuskegee. According to Jacks, a few minutes later his sister informed him that Holt dove through the window. Jacks testified that he called 911, and informed the police that he had given Holt a screwdriver. When he walked outside, he saw people standing in front of Laymon’s door. After he asked them to move, he saw Laymon lying down. Then, he saw a person in shadow running behind the house. Jacks gave a statement to the police, and he subsequently identified Holt in a photographic lineup.
 

 Cindy Jacks, Jack’s sister, testified that, on the night of the incident, she saw a man walk across her mother’s yard, and then turn back around. According to Cindy Jacks, the man got the screwdriver after talking to her brother, Jacks. Then, the man returned to the house he shared with his girlfriend, who was killed that evening. She had seen the man on two prior occasions with his girlfriend and the two children. Cindy Jacks testified that later she saw the man hit the window with a screwdriver, and then throw his whole body into the window. She testified that she told her brother to call the police. A minute later, she saw a man, not Holt, run out of the house through the garage. Then, a few minutes later she saw another man run out of the front door of the house and collapse approximately two houses away. Cindy Jacks could not identify Holt in court.
 

 Homicide Detective David Morales (“Detective Morales”) testified he participated as the scene investigator in the investigation with Sergeant Eddie Klein (“Sergeant Klein”). On the scene, Detective Morales noticed that a pane of glass in the lower left corner of the front twenty-pane window was broken. Some glass from the broken pane remained in the aluminum
 
 *505
 
 frame and one piece of glass |5was on the ground in front of the window. Detective Morales opined that there had been a struggle where Laymon was found, near the front door, because there were areas of blood caused by an arterial wound, disheveled furniture, and a broken chair. He also found a knife with a blood-like substance on it on a couch near the front door. In addition, he found a robe with cut marks between two sofas in the living room, close to the hallway and a torn piece of the robe was also found in the master bedroom connected to the doorknob. Detective Morales opined that the cut marks on the robe were caused by stabbing. There were also some blood patterns in the middle of the floor in the hallway and a blood-like substance on the rear bottom of the door and above the doorknob.
 

 More bloody evidence was found in the kitchen, and there were footprints in blood that appeared to go toward the garage. In the garage, there was a vehicle and a washing machine, inside of which was a hammer with a blood-like substance on the head and a black-colored knife with a five-inch blade, towels, and a large shirt with a blood-like substance on them. There were more bloodied footprints of a tennis shoe leading out of the garage, as well as a swipe pattern blood transfer along the driver’s side of the vehicle, which Detective Morales opined was caused by someone passing by the vehicle, the only way in and out of the garage.
 

 Dwanne Wiltz (“Wiltz”) testified that she was a co-worker and best friend of Laymon, She had met Holt, whom she identified in court, through Laymon at their jobsite. Wiltz testified that Laymon and Holt were dating, but not living together. Wiltz testified that, the morning after Laymon’s murder, and after she learned of the murder, Holt called her a few times. According to Wiltz, during the first telephone call at her jobsite, Holt identified himself and Wiltz also recognized his voice. Wiltz testified that Holt asked her if he had talked to Laymon, then told her, “[You] needed to call her because she was hurt real bad and that he had hurt her, |Bthat I needed to call and check on her.” Wiltz testified that she directed her co-workers to call 911, and kept Holt on the telephone as long as she could, in order for the police to catch him. According to Wiltz, in the first telephone call, Holt continued to repeat that he hurt Laymon and that Wiltz should call her. Holt did not describe the details at that time.
 

 Wiltz testified that Holt called her a second time on her cell phone. Wiltz, who gave Holt her cell phone number in order to prolong the conversations with him, received a second call. According to Wiltz, she knew that Holt was trying to flee and needed money because he asked her for $68 to catch a bus to Atlanta. Under the impression that Lewis was the father of Wiltz’s children, Holt told Wiltz that “they [Lewis and Laymon] must have been meeting.” Wiltz testified that Lovell Lewis worked with her and Laymon, and when asked if Laymon and Lovell Lewis had started a relationship prior to the incident, Wiltz responded, “Yeah, I believe so.” During their second conversation, Holt repeatedly told her, that “they were making fools of me and him and, you know [Holt] had been watching them for a while and they, I guess they deserved what [sic] they were, you know, going to get or whatever because they just kept messing, making fools of us.” Holt also told Wiltz that he and Laymon had an argument earlier on the day of the incident.
 

 Holt said that when he broke into the house Laymon, Lewis and Lewis’ brother, Lovell Lewis, were present. According to Wiltz, Holt told her that he went into the
 
 *506
 
 house through the window and hurt them, after he saw them holding hands and going toward the bedroom. Holt told her that he thought they were going to have sex and that he stabbed them. On a third call, Holt stated that he was trying to come to Wiltz’s house to hide out. According to Wiltz, during their telephone calls, Holt never expressed any remorse for his actions. She subsequently identified Holt in a photographic line-up.
 

 |7Sergeant Klein of the Jefferson Parish Sheriffs Office testified that he participated in the investigation. According to Sergeant Klein, after interviewing the witnesses and using some postcards found in the home written to one of the victims, a photographic lineup was developed that included a photograph of Holt. After Holt was identified in the photographic lineup by Lovell Lewis, Jacks, and Cindy Jacks, an arrest warrant was prepared.
 

 Sergeant Klein testified that Wiltz gave the police some telephone numbers connected to an address in New Orleans that assisted the police in locating Holt. When the police arrived at the address, Holt was walking in the street. He was advised of his rights, detained, and then transported to the New Orleans Police Department Sixth District. At the station, he was again advised of his rights using the rights form. Subsequently, Holt initialed each right, verbally acknowledged that he understood his rights, signed the form waiving his rights, and gave a statement. At that time, Holt identified himself as “Derrick McThiney.” However, Sergeant Klein testified that Holt went by both names and identified Holt in court as the person whom he interviewed and who signed the form.
 

 According to his investigation, there were four people present during the murders: the victims, Lovell Lewis, and Holt. Sergeant Klein admitted that, during his statement, Holt said he was upset and in shock. Holt told him that “if he ‘knowed [sic] what the situation would have occurred [he] wouldn’t have went [sic] into that house.” Sergeant Klein acknowledged that photographs of Holt’s arms and hands showed cuts or lacerations and admitted that Holt told him that the cuts on his fingers occurred when he grabbed the blade of the knife. Sergeant Klein also conceded that some of the wounds
 
 on
 
 Holt’s arms appeared to be relatively fresh.
 

 | sHolt’s statement was admitted into the record. In it Holt explained why he was also known as Derrick McThiney. Holt and Laymon had argued earlier in the day. When Holt returned to the house, his key did not work so he asked the neighbor for a screwdriver; while trying to take out the window pane, the glass broke. Holt let himself in and saw “Narcissa [Laymon]” in her robe and the guy with her said he was going to “go get my heat for this n_” Holt was shocked but not angry. Holt stated that the male victim reached for a knife, but Holt grabbed it first, cutting himself. He feared for his life. Holt stabbed the victim in the chest, but as the victim staggered toward the garage, Holt stabbed him in the back, leaving the knife in the victim. Laymon picked up a knife, and Holt wrested it from her and she fell. He stabbed her as she reached for something. She was on the floor at the time. He stabbed her again, in the back, as she went to the kitchen, because he thought she was going to get another knife. Lay-mon ran to the front door. Holt left out the front door. She was alive when he left. Holt got some other clothes to replace the bloodstained ones, which he threw away. He called a friend the next day to see if anyone had heard from her. He did not plan the murders.
 

 
 *507
 
 Michael Rodrigue (“Rodrigue”), a convicted felon, testified that he met Holt while incarcerated in Angola because of Hurricane Katrina. Rodrigue testified that he asked Holt why he was in jail, and Holt told him that he killed two people, on Tuskegee Drive. Holt described how he committed the murders with two knives. According to Rodrigue, he did not know either of the murder victims or their families. Rodrigue testified that he sent letters to the District Attorney in order to prevent Holt from getting away with the murders because the same thing happened to his sister.
 

 Rodrigue stated Holt told him that, on the date of the incident, he went to the store at Laymon’s, request. When Holt returned, a man told him that there was a 19car in the garage. Then, he got a screwdriver from someone across the street or next-door in order to get through the window because the door was locked and there was something placed behind it. After he got into the house, Holt took a knife from the kitchen, cuffed the knife under his hand to conceal it, and then went to the back. Rodrigue testified that Holt told him that Laymon and a man, presumably Lewis, were naked in bed together having sex. As Holt got to the door, Lewis got up. According to Rodrigue, Holt told him that he let Lewis get dressed, and then Lewis started walking down the hall. As soon as Lewis put his hand on the door of the garage, Holt began stabbing him in his back with a knife. Lewis and Holt began wrestling for the knife. Rodrigue testified that Holt described the floor as having “so much blood” that Lewis slipped in his own blood and fell. After Lewis fell, Holt got on top of him and started stabbing him. Laymon grabbed Holt in order to stop him. In response, Holt stabbed Lewis harder one time in his back with the knife, leaving one of the knives in Lewis’ back. According to Rodrigue, Lewis had to crawl under the garage door for assistance. Ro-drigue testified that Holt told him that he “got scared” because he did not know where Lewis was after he stabbed him; however, Holt told him that he knew Lewis was going to die.
 

 Then, Holt just turned around and started stabbing Laymon in her back and shoulder with the knife. Rodrigue testified that Holt told him that Laymon tried to get away through the front door. However, something placed behind the door prevented her from escaping Holt in time and, therefore, “[Holt] did her at the door.” According to Rodrigue, Holt told him that at one point, he stabbed Laymon to her bone causing the knife to pop right out of his hand and allowing Laymon to get out the door. Her body fell in the front yard. According to Rodrigue, Holt | instated that “[w]hat he really was going to do was hold [Laymon] down, after he stabbed her, hold her down and just like smother her, let her die.”
 

 Rodrigue testified that Holt told him that he ran outside, and then walked down Lapalco before going to someone’s house. Subsequently, Holt placed a call to a woman that he did not identify. A couple of minutes later, the police arrived. Ro-drigue also testified that Holt told him that he called Laymon’s mother to see if everything was okay. According to Rodrigue, Holt showed no remorse for the murders. According to Rodrigue, Holt told him that he was going to get away with the murders by seeing a psychiatrist and playing crazy.
 

 Dr. Karen Ross, a forensic pathologist with the Jefferson Parish Coroner’s Office, testified that she did autopsies on Laymon and Lewis. Dr. Ross’ external examination of Laymon revealed multiple sharp force entry wounds to the front and back of the body, and Laymon’s wounds were consistent with the use of a knife. The
 
 *508
 
 wound into Laymon’s heart was “a very severe potentially lethal wound.” Another one of the multiple wounds, made while the victim was still alive, was on the lower side of Laymon’s left back, went through her stomach and liver into the diaphragm and left chest cavity. Dr. Ross testified that one of the major mechanisms of Lay-mon’s death was hemorrhage. In addition to the multiple stab wounds, Dr. Ross observed wounds to Laymon’s chin and head, as well as defensive wounds to her left hand and index finger. Dr. Ross testified that Laymon’s death was a homicide.
 

 Dr. Ross testified that her external examination of Lewis revealed multiple sharp force entry wounds to the front and back of the body. One of those wounds made vertically on the right side of Lewis’ chest extended through the right lung downward into the inferior vena cave, a major blood vessel in the body. Dr. Ross described this wound as being lethal within minutes. Dr. Ross agreed all but one | nof the multiple stab wounds appeared to have been made with a knife. According to Dr. Ross, the remaining stab wound appeared to have been made with a flathead screwdriver. Dr. Ross also observed injuries to Lewis’ scalp, which included a fractured skull caused by the entry of a knife. According to Dr. Ross, Lewis also had wounds on his right ear and defensive wounds to his right hand and the back of his left middle finger. Dr. Ross testified that Lewis’ death was also a homicide.
 

 Aiseha Prudhomme, a fingerprint expert with the Jefferson Parish Sheriffs Office, identified partial prints from broken glass at the crime scene as those of Derrick Holt.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 Holt argues that the trial court erred in failing to give requested jury charges on self-defense, urging that this prevented him from presenting the defense to the jury. During trial and on appeal, Holt claims that the introduction of his statement by the State was sufficient evidence upon which to base the self-defense argument and that he was frightened after entering the residence because one of the men present had a gun. In addition, he argues that, through the testimony of Sergeant Klein, he showed that he had relatively fresh wounds at the time of his arrest and that the photographs taken at the time of his arrest showed wounds to his arms and fingers.
 

 La.C.Cr.P. art. 802(1) provides that the trial court shall charge the jury on the law applicable to each case.
 
 [1]
 
 The trial court is required to charge the jury on the law applicable to any defense theory when properly requested, which the jurors could reasonably infer from the evidence.
 
 [2]
 
 The evidence presented, at trial, must support the requested special charge. The trial judge’s failure to give a requested jury instruction constitutes reversible error only when there is miscarriage of Injustice, prejudice to the substantial rights of the accused, or substantial violation of a constitutional or statutory right.
 
 [3]
 
 In addition, the trial judge should give the requested special charge if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. La. C.Cr.P. art. 807.
 

 A homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger
 
 *509
 
 of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20(A)(1). “A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.” La. R.S. 14:21.
 

 In the present case, the only evidence of self-defense came from Holt’s statement to the police that, when Lewis saw him, Lewis said he was going to “get some heat” and he and Holt both grabbed for a knife at the same time. However, Holt also stated that he stabbed the victim in the back as he staggered toward the garage. At that point, Holt was plainly not in imminent danger from Lewis. Further, Holt stated that he stabbed Laymon first as she was on the floor and again in the back as she moved toward the kitchen. Both victims exhibited defensive wounds, and the forensic evidence disclosed that Holt used more than one weapon on Lewis. In addition, Holt broke into the house holding a potential weapon, the screwdriver. He was clearly the aggressor and none of the evidence indicated that he wished to withdraw from any potential conflict.
 

 In addition, the testimony of Wiltz shows that Holt began the attack when he saw the victims because they were making a fool of him and they deserved what happened to them. Rodrigue’s testimony evidenced that Holt planned to harm the | ^victims when he entered the residence. Under these circumstances, the jury could not have reasonably inferred self-defense and the evidence did not support a charge of self-defense. This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 Holt urges that the trial court erred in giving the jury an improper jury charge on reasonable doubt. He argues that the court violated his constitutional right to due process by including the word “substantial” in the jury instruction on reasonable doubt because it suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard.
 

 In the present case, the trial court gave the following pertinent portion of the reasonable doubt instruction to the jury:
 

 A person accused of a crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt. This doubt must be a reasonable one, that is, one found upon a real, tangible, substantial basis and not upon mere caprice, fancy or conjecture. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. It is the duty of this jury if not convinced of the guilt of the defendant beyond a reasonable doubt, to find him not guilty.
 

 La.C.Cr.P. art. 804(A) states in pertinent part that “the court may, but is not required to, define ... ‘reasonable doubt’ or give any other or further charge upon the same than that contained in this article.” A jury charge is not incorrect when, taken as a whole, a reasonable person of ordinary intelligence would have no problem understanding the definition of reasonable doubt.
 
 [4]
 
 When considering an allegedly improper jury instruction, a reviewing court must determine whether it is “reasonably likely” that the jury applied
 
 *510
 
 the challenged instruction in an | ^unconstitutional manner, not whether it is possible that the jury misapplied the instruction.
 
 [5]
 
 In determining whether it is reasonably likely that the jurors misapplied the instruction, the challenged terms are considered in relation to the instructions as a whole.
 
 [6]
 
 A conviction will not be reversed on grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial.
 
 [7]
 

 This Court has previously found no error in the almost identical instruction.
 
 [8]
 
 Similarly, using the above standards, we do not find error in the jury charge relating to reasonable doubt. This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 

 Holt argues that the jury might have returned a verdict of manslaughter on both counts, if it had been given the requested instruction on self-defense or correct charge on reasonable doubt, and, therefore, the errors were not harmless.
 

 We have held hereinabove that there was no error in either the reasonable doubt instruction or in the refusal of the trial court to give the requested self-defense charge. Therefore, a harmless error analysis is unnecessary.
 

 This assignment of error merits little consideration.
 

 PRO SE ASSIGNMENT OF ERROR NUMBER ONE
 

 Holt claims that he received ineffective assistance of counsel because his counsel failed to plead him not guilty by reason of insanity, after the Sanity Commission found that he suffered from mental illness causing retardation. He contends that his mental illness, at the time of the offense, is an essential element of the crime, arguing that had he been pled not guilty by reason of insanity, then |lfithe trial judge would have been obligated to give an instruction on sanity, and the jury could have considered the evidence based on that instruction. Holt claims that, even though the Sanity Commission determined he was competent to stand trial, his attorney should have further investigated his mental illness. According to Holt, the insanity defense was the only plausible defense and, therefore, he was prejudiced by his counsel’s deficient performance.
 

 An ineffective assistance of counsel claim is most appropriately addressed through an Application for Post-Conviction Relief filed in the trial court where a full evidentiary hearing can be conducted.
 
 [9]
 
 When the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised by an Assignment of Error on appeal, it may be addressed in the interest of judicial economy. Where the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-conviction proceedings under La.C.Cr.P. arts. 924-930.8.
 
 [10]
 

 
 *511
 
 In the present case, the record is insufficient to address Holt’s particular claims of ineffective assistance of counsel. This claim should be addressed through post-conviction proceedings.
 

 Attached to Holt’s
 
 pro se
 
 brief is an indeterminate document entitled “Oral Argument Review” in which the defendant asks us to “take consideration” of certain arguments for “discussion” at oral argument. Inasmuch as it itself is not a brief, and because two of these “arguments” have not been assigned as error in either the defense or the
 
 pro se
 
 brief, we need not consider them as assignments of error. Nevertheless, we deem it judicious to address the item as follows.
 

 | ifiHolt avers there was sufficient evidence regarding the defense of justifiable homicide, which argument has already been addressed. Next, Holt appears to argue that the police investigation was incomplete and that there were discrepancies in the police reports. These matters generally involve questions of credibility that were resolved by the jury and are not reweighed on appeal. Finally, Holt argues that admission of the 911 tape of Lovell Lewis, absent his testimony, violated Holt’s right to face his accuser. At trial, two 911 tapes were admitted. It is unclear from the record whether Holt’s attorney objected to the Lovell Lewis tape’s admission at the trial, although he did so at the Motion to Suppress. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A). Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. In the absence of any clear objection or articulated grounds for such, we will not consider this issue.
 

 ERROR PATENT REVIEW
 

 We have reviewed for errors patent and find none.
 

 AFFIRMED.
 

 [1]
 

 .
 
 State v. Lawson,
 
 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516.
 

 [2]
 

 . Id.
 

 [3]
 

 .
 
 Id.
 

 [4]
 

 .
 
 State v. Harris,
 
 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187.
 

 [5]
 

 .
 
 State v. Martin,
 
 04-924 (La.App. 5 Cir. 1/25/05), 895 So.2d 55 (citing
 
 Victor v. Nebraska,
 
 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)).
 

 [6]
 

 . Id.
 

 [7]
 

 .
 
 Id.
 

 [8]
 

 .
 
 See, State v. Harris, supra.
 

 [9]
 

 .
 
 State v. Kron,
 
 07-1024 (La.App. 5 Cir. 3/25/08), 983 So.2d 117, 120,
 
 writ denied,
 
 08-0813 (La. 10/24/08), 992 So.2d 1039.
 

 [10]
 

 .
 
 Id.