JUDE G. GRAVOIS, Judge.
| gDefendant, Darius A. Duckett, appeals his convictions for second degree murder and attempted second degree murder. On appeal, he argues that the trial court erroneously denied his motion for severance and later motion for a new trial. He also argues that the trial court erred when it failed to give the requested jury instruction on self-defense. For the following reasons, we affirm defendant’s convictions and sentences, finding no merit to the assignments of error.

PROCEDURAL HISTORY

On July 29, 2010, defendant, Darius A. Duckett, was indicted by a Jefferson Parish grand jury for the second degree murder of Marvin Newman in violation of La. R.S. 14:30.1 (count one) and for attempted second degree murder of Teri Creagh in violation of La. R.S. 14:27 and La. R.S. 14:30.1 (count two). Co-defendant, Kevin P. Holmes, was also indicted on the same charges. Defendant filed a motion to suppress statement, which was denied on February 4, 2011.[1] Cojdefendantg Holmes filed a motion for severance. Defendant joined in the motion for severance, which was denied on May 27, 2011.
On November 9, 2011, defendant orally re-urged his motion for severance, which the trial court again denied. After defendant’s objection was noted, defendant was arraigned and pled not guilty to both charges. Immediately thereafter, trial commenced and continued until November 11, 2011, when a 12-person jury unanimously found defendant guilty as charged as to both counts.[2]
On December 9, 2011, defendant filed a motion for a new trial, arguing the following: the verdict was contrary to law and the evidence; the trial court erred by denying his motion for severance, which violated his right to a fair trial and his Sixth Amendment right to confront his accuser, who was a co-defendant who did not take the stand and could not be cross-examined; and the ends of justice required that he receive a new trial. On December 12, 2011, the trial court denied the motion. Defendant waived sentencing delays and was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence on count one, and 50 years imprisonment on count two, to be served consecutively. Defendant objected to his sentence and orally noted his intent to appeal. Defendant also filed a written motion for appeal on December 12, 2011, which was granted on December 14, 2011.

FACTS

On the night of August 22, 2009, a party was held in the 3000 block of Mt. Kennedy Drive in Jefferson Parish. A 9-1-1 call was made after several gunshots were heard. Deputy Shannon Sims of the Jefferson Parish Sheriffs Office responded to the call within a minute and saw a black male lying on the ground about a block and a half from Rochester and Mt. Kennedy, his clothes covered in Lblood. Although the victim was still alive, he was barely moving and was not responsive. Deputy Sims did not find a gun in the victim’s clothing, in his hand, or in the area around where he fell. EMS arrived and transported the victim to West Jefferson Medical Center. The 20-year-old victim, *171 Marvin Newman, died from multiple gunshot wounds.[3] Another victim, Teri Creagh, was shot in her left thigh, and was taken to West Jefferson Medical Center as well.
Candice Cobena was at Lakeyda’s[4] house on Mt. Kennedy Drive for the party on August 22, 2009. She was outside the house, arguing with Marvin Newman, whom she had previously dated. She said that co-defendant, Kevin Holmes, whom she knew as “Chopper,” arrived in a gold G6 Pontiac and pulled up in front of La-keyda’s house, but did not get out of the car. The car door opened, and defendant was seated in the driver’s seat.[5] She also noticed that “Whop” pulled up in a green Pontiac, but parked on the opposite side of the street across from Lakeyda’s house.
As Candice and Marvin were arguing, Whop, who was in the middle of the street and parallel to Holmes’ car, said to Marvin, “Don’t your girl got my cousin’s name on her.” Candice explained that Whop was talking about her, apparently in reference to a tattoo she had. Marvin asked Whop to repeat what he said and when Whop went to open his mouth, Marvin punched him. Whop fell, holding his jaw, and said “Get him, Cuz.” Candice testified that after Whop said this, Holmes exited his car from the driver’s side with a gun in his hand, raised the gun, and started shooting. She testified that the shooting started on Mt. Kennedy in the middle of the street on the side of the G6 and that Holmes and Marvin were very Rclose to each other. Candice testified that Marvin turned around and ran down Rochester, a street perpendicular to Mt. Kennedy, and Holmes ran down the street behind him. She said that Holmes followed Marvin and “they just kept shooting.” According to Candice, Holmes stopped shooting when he reached Rochester, and then ran back to his gold car and left.[6]
In the early morning hours following the shooting, which she believed might have occurred around 8:30 p.m., Candice identified Holmes in a photographic lineup and also provided statements about the incident.[7] She testified that she was 100 percent positive that Holmes was the person she saw shoot Marvin. She also testified that she could not tell at the time of the shooting how many people were actually firing guns.
Candice said that defendant was in the vehicle with Holmes when he arrived. She had known defendant for about one or two years from high school. However, she did not know where defendant was at the time of the shooting.[8] She testified that she did not know if defendant had a gun, but thought it could be possible that defendant was shooting a gun at Marvin, saying “I wouldn’t put it passed [sic] him.” She said she believed all of the shots happened at *172 the same time. She said that Holmes was wearing a white “tank” on the night of the incident, while defendant was wearing all black.
Bervin Wright testified that on the night of the shooting, he observed someone wearing a white tank top with a gun. He recalled two guys leaving a car and going down the street. He recalled that someone said, “they’re shooting.” He was not able to make identifications, however.
IfiTeri Creagh, a visitor to the neighborhood who was not connected to the party on Mt. Kennedy, was shot in her left thigh, but did not see the person who fired the gun. She testified that she heard gunshots being fired and thought they were coming from the driver’s side of a vehicle parked behind her car.
Casings and other ballistic evidence were collected from the scene. A cluster of .380 caliber casings was found. All of the .380 caliber casings were recovered between the street and the house at 3000 Mt. Kennedy. A cluster of .40 caliber casings was also found. Additional .40 caliber casings were recovered down Rochester. A projectile went through a telephone box close to the corner of Mt. Blanc and Rochester and lodged into the equipment. Also, another projectile struck the residence at 3001 Mt. Blanc.
The ballistic evidence on the scene established that two types of guns were involved, a .40 caliber and a .380 caliber. On Mt. Kennedy, five .380 caliber casings and one .40 caliber casing were recovered. A total of six casings were found on Rochester, which were all .40 caliber casings. According to detectives who investigated the incident and testified, the scene suggested that the starting point of the incident was at 3000 Mt. Kennedy, moving down Rochester to Mt. Blanc.
Jene Rauch of the Jefferson Parish Sheriffs Office Crime Lab testified as an expert in firearms examination and tool-mark examination. She examined cartridge casings and projectiles from the scene and then examined projectiles collected from the autopsy and compared them. She examined six .380 caliber casings and determined that all were fired from the same weapon. She also examined seven .40 caliber casings and determined that all were fired from the same weapon. After examining the .380 caliber casings and the .40 caliber casings, she did not believe that they could have been fired from the same gun. She concluded that based on |7the evidence, at least two weapons were involved. She also compared two jacketed projectiles, which were received from the morgue, and determined that they were fired from the same weapon and were consistent with a .380 caliber weapon. No guns were located in connection with the shootings. Further, no gun was recovered from the victim, Marvin.[9]
Although only two projectiles were recovered from the victim’s body during the autopsy, he sustained five separate gunshot wounds. Dr. Karen Ross, an expert in the field of forensic pathology, performed the autopsy on the victim and testified that he was alive when he sustained all wounds, as evidenced by the hemorrhage associated with each one. She concluded that of the five gunshot wounds, three of the wounds were consistent with back to front wounds, ie., the victim was shot from behind.
Deputy Abraham Andino of the Jefferson Parish Sheriffs Office also responded *173 to the call on the night of the shooting to investigate the homicide.[10] He testified that this was a large crime scene that started at the 3000 block of Mt. Kennedy and continued down Rochester. Deputy Andino interviewed Candice at the detective bureau. As a result of this interview, Holmes was developed as a potential suspect in the shooting. She positively identified him in a photographic lineup and also gave a statement. Deputy Andino located Holmes and transported him to the detective bureau. After he indicated that he understood his rights, Holmes gave a statement. In his initial statement, Holmes did not indicate that he was involved in the shooting on Mt. Kennedy. In fact, he indicated that he was not even there.[11] Deputy Andino testified that because Holmes had his cell phone on him, he requested and received consent to get the cell phone triangulations to see if | sHoImes was in the area at the time of the shooting. However, Holmes later changed his story and admitted that he was present at the time of the shooting.[12] Knowing that Whop, Holmes, and a friend went to West Jefferson Hospital, Deputy Andino viewed the security tapes from the hospital.[13] An arrest warrant was prepared for Holmes based on the investigation. However, even after Holmes was arrested, the case was not closed because it was believed that there was a second shooter. Further investigation led the detectives to locate defendant.
Defendant was read the rights of arres-tee or suspect form on March 26, 2010, months after the incident, and gave a statement.[14] Therein, defendant stated that he knew Marvin from high school and said that Marvin picked on him and was a “bully towards” him. He said he went to the party on the night of the shooting with his cousin Kevin (co-defendant Holmes) in a “bluish colored gold” G6, which Kevin parked almost in front of the house. He explained that Whop arrived at the party about 10 or 15 minutes after them and was in his “bluish turquoise color Gran Prix [sic].” Whop’s girlfriend, Brittany, was with him, and they parked the vehicle across the street. He said that he saw Marvin’s girlfriend, Candice, walk towards Marvin and they began arguing. He said that Donovan (Whop) said something about the tattoo Candice had of another man and Marvin came and “succor punched [sic]” Whop in his jaw. After this, he recalled closing his eyes, putting his head down, and shooting. He said he was in the middle of the street in front of a car. He said he did not think he had hit Marvin when he saw him running away, so he ran towards the car and pulled off in the G6 he had arrived in. He said the car had been left running. He said Whop asked him for a gun, but he | fldid not give him one and then Whop ran off and more shots were fired. He did not see anyone else shooting because he was in the car, *174 facing the opposite direction. He said he did not know where Kevin was at the time of the shooting and denied that he saw Kevin shoot.
Defendant believed he may have shot three times, but was not sure. He said he did not really aim the gun at Marvin, but was shooting in his direction. He said when he fired the gun, he was stationary and his head was down. He claimed he shot in self-defense and knew Marvin had a firearm on him because he saw it on the right side of his hip. He said he had the gun for protection and was not sure of the kind of gun, but believed it was a semiautomatic and was probably “between a nine (9), something close to that.” He said the gun was tucked in his pants. He said he shot Marvin to get away from him because he was scared when Marvin came at him. He said he did not intend to kill Marvin, he just wanted to get away from him.
Defendant said he went into the hospital with Brittany and Whop, whose jaw was broken in three places. He said that he later hid the gun under a garbage can, and that someone from the neighborhood took it and would not give it back.
An arrest warrant was later prepared for defendant, and he was ultimately arrested. Deputy Andino testified that prior to defendant’s statement, they had the identity of one shooter, and then after his statement they had an identity for the second shooter.
Deputy Andino admitted that he took statements from various people and no one said they saw defendant fire a gun that night. However, the crime scene suggested that there were two clusters of bullet casings in two separate locations. The .380 caliber casings were in front of the house where the party was and the .40 caliber casings were down Rochester and behind a vehicle. There were also .40 _jjicaliber casings that trailed down the street where the victim was located. Candice said she saw Holmes running behind the victim on Rochester firing a gun. Deputy Andino agreed that the facts he gleaned from his investigation did not conflict with the details given in defendant’s statement. Deputy Andino testified that defendant said he was stationary and close to the sidewalk while he fired his shots. Deputy Andino believed that this was consistent with the .380 caliber casings found close to the sidewalk.
At trial, defendant testified that he went to the party at 3000 Mt. Kennedy on August 22, 2009, with his cousin, Holmes, in a G6. Holmes drove and parked in front of the house. Defendant said he got out of the car, but Holmes remained in the car. Defendant testified that he saw Candice and Marvin arguing in the middle of the street between Rochester and Mt. Kennedy. The G6 was parked a few feet from where they were arguing. Defendant admitted that he had previously had “words” with Marvin. He said words were exchanged between Marvin and Whop and that Whop had said something about a tattoo on Candice for his cousin. He saw Marvin punch Whop and then saw Holmes get out of his car and then shots were fired. Defendant testified that he saw Holmes shoot. Defendant said he observed Marvin running down Rochester, stumbling. Defendant also said he heard a second set of shots, but did not know who fired them.
Defendant said that after the shooting, he got into the car Whop had arrived in that night. He said that Whop and Brittany switched seats for Whop to drive because she was driving too slowly and that they went to the hospital. He said that he noticed that Holmes pulled off behind *175 them in the G6.[15] Defendant admitted that he was seen in the videotape walking into the hospital with Holmes. Defendant said he followed Whop to the bathroom, washed his hands, and left. [^Defendant said he stayed at the hospital for about ten minutes. Defendant went home after he left the hospital.
Defendant testified that he did not speak with the detectives until about seven months after the shooting. He said Deputy Andino brought up the issue of self-defense. Defendant said that he was told if he said it was self-defense, his cousin would go home and nothing would happen to him. He explained that the detectives wanted him to say his cousin did it. He also said he asked to speak to an attorney several times. He testified that his statement, which said he was the shooter, was not true. He said he lied because he wanted to help his cousin. He testified that he had nothing to do with the shooting.
On cross-examination, defendant admitted that he had signed an affidavit after he told Holmes’ attorney that Holmes did not fire a gun that night. He said that it was not true that Marvin bullied him, as he had said in his statement. Defendant said everything else in his statement was true, except for when he said he was a shooter.

ASSIGNMENT OF ERROR NUMBER ONE

Denial of severance and motion for a new trial

Defendant argues that his motion for severance and motion for a new trial should have been granted because the two defendants had conflicting defenses and blamed the other for being the lone shooter. Defendant argues that the defendants were forced to defend against the State and each other. Defendant argues that the later denial of the motion for a new trial based on these same grounds was error, contending that the trial court heard all of the testimony and the antagonistic defense theories presented. Defendant argued that he was essentially denied his right to present a defense, since it was never a possibility for co-defendant Holmes to testify because the two were not severed for trial. Defendant suggests that this h J3ruton[16] violation was not harmless. Defendant concludes that because only his own statement inculpates him in this crime, the error was not harmless.
The State responds that defendant did not offer any evidence in support of a severance. The State contends that defendant only presented vague and general representations that the defenses presented at trial would be antagonistic, and that such conclusory statements were insufficient to satisfy his burden regarding the severance. Moreover, the State contends that the evidence established that there were two shooters involved in the incident, and therefore, the matter was one of respective roles in the crime as to the two perpetrators. The State also argues that defendant has failed to show how he was prejudiced by the lack of a severance, noting that the statements of Holmes introduced at the joint trial did not mention defendant, much less implicate him in the shooting. The State adds that whether he was tried jointly or individually, defendant would have been faced with the same highly incriminating evidence of his guilt. The *176 State further notes that the fact that the jury returned verdicts of guilt as to both defendant and Holmes demonstrates that the jury found each man to have been legally culpable.
Further, the State argues that defendant’s Bruton argument fails because defendant was not implicated in the crime by his co-defendant’s statements. Finally, the State argues that defendant failed to demonstrate that Holmes would have testified on behalf of defendant at a separate trial or that such testimony would have proven exculpatory to defendant. The State contends that the trial court did not abuse its discretion in denying the defendant’s motion for a severance and/or motion for a new trial.
The trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 19, writ denied, 11-0282 (La.6/17/11), 63 So.3d 1039. “The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.” La.C.Cr.P. art. 851.
Prior to trial, Holmes filed a motion for severance, and on May 27, 2011, defendant joined in this motion and requested a severance. Defendant argued that it was not fair to defend against the State and his co-defendant at the same time. The State argued that a severance was not required because its theory was that there were two shooters who had separate weapons involved in this case. The State argued that neither defendant could exculpate himself at the other’s expense. The judge decided that trying the defendants together would not prohibit a defense and it found no Bruton or Crawford problems.[17] The judge also said that he did not believe that justice required a severance at that time. Both defendants objected to this ruling.
On the day of trial, November 9, 2011, defendant and his co-defendant re-urged the motion for severance. Defendant argued that the defenses would be antagonistic and that each defendant would place the blame on the other for the shooting. Defendant argued that he would be denied the right to confront his accusers. The judge denied the motion, noting their objections. Thereafter, trial commenced and the co-defendants were tried together.
After defendant’s convictions, defendant filed a motion for a new trial, which included an argument regarding the denial of his motion for severance. In this motion, defendant argued that the denial of the severance motion resulted in the denial of a fair trial and violated his Sixth Amendment right to confront his 1 Uaccuser, Holmes. Defendant noted that because his co-defendant did not take the stand, he was not allowed to cross-examine him.
On December 12, 2011, defendant’s motion for a new trial was heard. Defendant argued that, as had been asserted in the two pre-trial motions for severance, he actually had to defend against both the prosecution and his co-defendant at the same time at trial, that each co-defendant implicated the other, and that he believed he received an unfair trial. Defendant argued that his co-defendant could not be called to the stand to testify in the joint trial and he was not able to confront his accuser, which denied him his Sixth Amendment right to confrontation.
*177 The State argued that defendant was not prejudiced in being tried with his co-defendant and believed that defendant actually received a benefit in being able to blame his co-defendant and in having evidence against his co-defendant introduced at trial. The State argued that the case involved the degree of culpability between the two defendants and not one blaming the other. The court denied the motion for a new trial as to the severance, agreeing with the State that there was no prejudice to defendant and that the case came down to the degree of culpability. Defendant objected to this ruling.
La.C.Cr.P. art. 704 states as follows:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984); State v. Coe, 09-1012 (La.App. 5 Cir. 5/11/10), 40 So.3d 293, 301, writ denied, 10-1245 (La.12/17/10), 51 So.3d 17. A defendant is not entitled to a severance as a matter of right, but the decision rests within the sound discretion of the trial court. State v. Coe, supra. A denial of a motion to sever will not be overturned absent a clear abuse of discretion. Id.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State. State v. Prudholm, 446 So.2d at 741; State v. Coe, 40 So.3d at 301. The defendant bears the burden of proof in a motion to sever. State v. Coe, supra. The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. State v. Prudholm, 446 So.2d at 741; State v. Coe, 40 So.3d at 301. “Justice does not require severance where only the extent of participation of each defendant is at issue.” State v. Gaskin, 412 So.2d 1007, 1012-13 (La.1982).[18]
The Supreme Court recognized the following in State v. Bradford, 367 So.2d 745, 747 (La.1978):
Where a crime involves more than one actor, the need arises to balance the interest of the State in trial economy against the rights of defendants to separate trials. Joinder expedites the administration of justice, reduces the congestion . of the trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.
Another policy consideration implicit in the mandate of Article 704 that jointly indicted defendants shall be jointly tried is the need to present the whole case at one time where, as here, several defendants are involved in the same transaction. The State’s policy is supported by the general principle that the State decides when, how, and whom to prosecute and should therefore be permitted to *178 join offenders under appropriate circumstances.
Id. (internal citations omitted).[19]
11BIn the present case, this Court is reviewing the rulings on pre-trial motions and a motion made after trial regarding severance. In reviewing a pre-trial motion for severance, the Louisiana Supreme Court, in State v. Lavigne, 412 So.2d 993, 997 (La.1982), held: “It is incumbent upon us to review the validity of the ruling without regard to whether at trial substantial other evidence was introduced or whether his conviction would have been a certainty irrespective of the joint trial.”[20] La. Prac.Crim. Trial Prac. § 14:25 (4th ed.) explains:
If the motion to sever is not made until after the trial commences, the conviction will not be reversed for its denial even if a severance was warranted unless the court finds the defendant “would probably not have been convicted” at a separate trial. If the motion is made pretrial and denied, the appellate court may not consider the weight of the evidence or the certainty of the defendant’s conviction in a separate trial in assessing the validity of the trial court’s ruling.
In the instant case, defendant failed to offer evidence in support of his pre-trial motions for severance. Instead, he only made general representations that the defenses presented at trial would be antagonistic. These conclusory statements alone were insufficient to satisfy his burden regarding the severance, especially when the prior statements by the defendants did not place blame on the other. Defendant’s statement did not mention Holmes by name or implicate him in the shooting. Instead, defendant admitted that he was a shooter. In Holmes’ statements, he did not mention defendant by name and said he did not see the shooter. Further, the State’s theory in this case was that there were two shooters. As such, even if defendant blamed his co-defendant for the shooting and his co-defendant blamed him for the shooting, as was speculated by counsel in his arguments, this did not rule out the possibility that both defendants were shooters and the matter was actually one of respective roles in the crimes committed by the|17two perpetrators. Accordingly, we find that the trial judge did not abuse his discretion in denying the pretrial motion for a severance in this case.
Further, at the time of the ruling on the motion for a new trial, which included an argument about the severance, the trial judge had the benefit of hearing the evidence and actual arguments in the case. Ballistic evidence supported the State’s theory and indicated that two separate weapons were used in the shootings. Also, testimony from witnesses, including defendant himself, suggested that there were two shooters, or at least that two sets of shots were heard. Holmes was positively identified as the gunman who exited from the driver’s side of the vehicle and shot at and chased Marvin, and defendant admitted, in his statement, his own role of getting out of the vehicle and shooting at the victim. The location of the .380 caliber casings supports defendant’s statement and his location, and the location of the .40 caliber casings is consistent with Holmes’ location and actions. As such, even if the *179 co-defendants had blamed each other for the shootings, this did not rule out the possibility that both defendants were shooters and the matter was actually one of respective roles in the crime committed by the two perpetrators.
Defendant has failed to demonstrate that justice required a severance or that he was prejudiced by the joint trial. Whether tried jointly or individually, defendant would have still been faced with the same incriminating evidence of his guilt, including his own statement in which he admitted that he was a shooter. The jury returned guilty verdicts as to both defendant and Holmes, demonstrating that they found each defendant legally culpable and did not believe that only one defendant was responsible for the crimes.
In State v. Turner, 365 So.2d 1352, 1354 (La.1978), the Louisiana Supreme Court stated, in pertinent part, the following:
11sWhere it is clear from the record that a co-defendant would give exculpatory testimony if a severance were granted, the denial of a severance is an abuse of discretion. See, La.C.Cr.P. art. 704, Official Revision Comment (c)(2). However, the burden is on the movant to establish that the co-defendant would, in fact, testify at a separate trial, and the exculpatory nature of his proposed testimony. See, 8 Moore’s Federal Practice, § 14.04(4).
In the instant case, defendant failed to demonstrate that co-defendant Holmes would, in fact, testify at a separate trial or that Holmes’ testimony would exculpate him. Also, Holmes’ statements were presented at trial. As such, the substance of Holmes’ version of the incident was presented to the jury. Accordingly, we find that defendant failed to show how justice required a severance or how he was prejudiced by the trial court’s denial of the severance or the motion for new trial pertaining to the severance.
Defendant suggests in brief that there was a confrontation violation due to his inability to confront his co-defendant. The Sixth Amendment to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852. Confrontation errors are subject to a harmless error analysis. Id. at 853; State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, 817, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
Defendant contends that there was a Bruton violation. In Bruton, the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his co-defendant’s incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. State v. Jackson, 04-1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 912, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162. Defendant’s reliance on Bruton is misplaced. Holmes’ statements, which were presented at trial, did not expressly implicate defendant (or himself). In fact, Holmes’ statement does not even mention defendant. Bruton does not apply at all when a co-defendant’s statements do not incriminate the defendant either on their face or when considered with other evidence. See Massey, 91 So.3d at 478.
Because we find that the trial court did not abuse its discretion in denying defendant’s motion for severance, it likewise did not abuse its discretion in denying defen *180 dant’s motion for a new trial based on the denial of the severance. As noted above, at the time of the ruling on the motion for a new trial, the trial judge had the benefit of hearing the evidence and arguments actually made at trial in considering whether any injustice had been done. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO

Inadequate jury instructions

Defendant argues that the trial court erred when it failed to instruct the jury regarding self-defense since it was a possible theory of the defense that the jury had to consider in deliberations, especially when he was cross-examined extensively about his claim to police that he acted in self-defense.
The State responds that no relief is warranted because self-defense was not a theory of the case advanced at trial, the evidence presented at trial did not support the requested charge, and the jurors could not have reasonably inferred from the evidence that defendant had acted against the victim in self-defense.
In the present case, defense counsel requested a jury instruction on self-defense out of “an abundance of caution,” since defendant mentioned self-defense in his taped statement. Defense counsel agreed with the judge, however, that no evidence at trial suggested self-defense other than defendant’s taped statement. [ ^Counsel stated that he was not putting forth a self-defense argument on behalf of defendant, noting that his defense was that he did not commit the offense, but that the request was in an abundance of caution in case the jury had questions after hearing self-defense in defendant’s statement. The judge said he would not prohibit an argument regarding self-defense to the jury, but did not believe the charge applied and did not believe that leaving the charge out would prejudice defendant’s substantial rights or violate defendant’s constitutional or statutory rights.
La.C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. State v. Cornejo-Garcia, 11-619 (La.App. 5 Cir. 1/24/12), 90 So.3d 458, 462. The trial court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence. Id. La.C.Cr.P. art. 807 mandates that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. State v. Cornejo-Garcia, supra. The evidence presented at trial must support the requested special charge. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. Id. at 462-63.
A homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20(A)(1). “A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the |⅞1 conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.” La. R.S. 14:21.
Although defendant mentioned self-defense in his statement when he explained that he shot Marvin, he later testified at trial that this statement was false. During trial, defendant did not argue that he com *181 mitted the crimes in self-defense. Instead, he argued that he did not commit the crimes altogether. He denied that he was a shooter, even though he originally admitted to this in his statement. Defendant’s counsel conceded that the defense was not based upon self-defense.
Further, the evidence presented at trial did not support a theory of self-defense. Marvin punched Whop; there was no evidence that defendant was in imminent danger of losing his life or receiving great bodily harm and that he had to kill the victim to save himself. Marvin received five gunshot wounds, three of which were consistent with back-to-front wounds. Testimony also suggested that Marvin tried to flee from the shooting and ran down the street, but that Holmes followed him. Also, evidence presented at trial showed that there were two shooters. As such, we agree with the trial court that a jury instruction on self-defense was inapplicable to the instant case, and thus, defendant was not entitled to a self-defense jury instruction.[21] This assignment of error is without merit.

ERRORS PATENT REVIEW

Defendant requests an error patent review in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
122The commitment does not reflect that the sentence for count two was imposed at hard labor. As such, we remand the matter for correction of the commitment. We direct the district court to make the entries in the commitment reflecting this change and direct the Clerk of Court to transmit the original of the minute entry to the officer in charge of the institution to which defendant has been sentenced, and to the Department of Corrections’ Legal Department. See La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).
Further, the trial judge failed to restrict benefits for the sentence defendant received for count two. The self-activating provision of La. R.S. 15:301.1 makes defendant ineligible for benefits. However, given the directive above to correct the commitment regarding hard labor, we also remand for correction as to the restriction of benefits.

CONCLUSION

For the above reasons, defendant’s convictions and sentences are affirmed.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

. Other pre-trial motions were filed, but the record does not reflect rulings for all of the motions. Nevertheless, when a defendant does not object to the trial court's failure to rule on a motion prior to trial, the motion is considered waived. State v. Wise, 05-221 (La.App. 5 Cir. 10/6/05), 916 So.2d 290, 293.

. Co-defendant Holmes was also found guilty as charged as to both counts.

. According to Dr. Karen Ross of the Jefferson Parish Coroner’s Office, the multiple gunshot wounds all contributed to the victim’s death.

. The transcript includes testimony that only presents first names of some of the individuals. One deputy believed Lakeyda’s last name was ’’Bibbins.” This is reflected in a subpoena request in the record. The transcript spells her name "Laquita.”

. Candice had known Holmes for about one or two months prior to this night.

. Candice testified that she did not see Marvin with a weapon or gun, but believed if he had one on him, he would have used the gun instead of punching Whop.

. Candice also identified "Chopper” (Holmes) in court.

. Candice identified defendant in court as the person she knew as Darius Duckett. She also knew that his nickname was "Dougie.”

. A gunshot residue test was performed on the victim, but the results were presumptively negative.

. Deputy Andino believed the initial call came in around 9:42 p.m.

. Holmes’ first statement was transcribed and presented at trial. The transcript was also published to the jury.

. Holmes’ second statement was transcribed and presented at trial. In this statement, Holmes explained that the victim and "Whop” were in an altercation and then Holmes ran after the victim to try and punch him and while he did this he heard gunshots, but did not see who was shooting. He said he heard a couple of gunshots and it sounded like it was different guns, about three guns. This statement was played for the jury at trial.

. Deputy Andino believed Whop’s name was Donovan Dunbar Collins. Despite efforts, the Sheriff's Office was unable to locate "Whop.”

. The transcript of the statement was published to the jury, and the taped statement was played in court.

. This trial testimony is apparently inconsistent with his statement, wherein defendant said that he went to the hospital in Holmes’ car.

. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

. Bruton v. United States, supra; Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

. However, where the ends of justice will be best served by severance, it should be granted. State v. Massey, 11-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 476, writ denied, 12-991 (La.9/21/12), 98 So.3d 332; State v. Coe, 40 So.3d at 302. See also State v. Webb, 424 So.2d 233, 236 (La.1982).

. See also State v. Williams, 416 So.2d 914, 916 (La.1982).

. “When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be; and after trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence which has actually been admitted.” State v. Foret, 96-281 (La.App. 5 Cir. 11/14/96), 685 So.2d 210, 224.

. See State v. Holt, 08-1276 (La.App. 5 Cir. 5/26/09), 12 So.3d 502, 510, writ denied, 09-1681 (La.3/26/10), 29 So.3d 1249, where this Court found that since there was no error in the refusal of the trial court to give the requested self-defense charge, a harmless error analysis was unnecessary.