STATE OF LOUISIANA

VERSUS

ORLANDO WASHINGTON

NO. 24-KA-550

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-2656, DIVISION "B"
HONORABLE R. CHRISTOPHER COX, III, JUDGE PRESIDING

August 27, 2025

**SCOTT U. SCHLEGEL**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Scott U. Schlegel

**AFFIRMED**
    **SUS**
    **JGG**
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
ORLANDO WASHINGTON
Lieu T. Vo Clark

**SCHLEGEL, J.**

Defendant, Orlando Washington, appeals his conviction and sentence for second degree murder in violation of La. R.S. 14:30.1. For the following reasons, we affirm.

In this case, three co-defendants, Orlando Washington, Daveon Gilmore, and Davon Gilmore, were charged with the February 21, 2022 second degree murder of Ahmad Howard.[1] After a six-day jury trial, the jury found defendants guilty.

*Procedural History*

On June 16, 2022, Orlando, Daveon, and Davon were charged by a grand jury indictment with the second degree murder of Ahmad Howard in violation of La. R.S. 14:30.1. Orlando's motion to suppress evidence and statements was denied after a hearing on March 26, 2024.

The case proceeded to trial before a twelve-person jury from August 19 to August 24, 2024. The jury unanimously found all three defendants guilty as charged on August 24, 2024. On September 30, 2024, Orlando filed a motion for acquittal notwithstanding the verdict and a motion for new trial. These motions were denied on October 15, 2024.

After Orlando waived sentencing delays on October 15, 2024, the trial court sentenced him to life imprisonment at hard labor without benefit of probation or suspension of sentence. The trial court stated that because Orlando was 17 years old at the time of the offense, he would be eligible for parole once certain conditions had been met.

On October 22, 2024, Orlando filed a motion to reconsider sentence and a motion for appeal. On October 23, 2024, the trial court denied the motion to reconsider sentence and granted the motion for appeal.

---

[1] For clarity, we will refer to Orlando Washington as "Orlando", "Washington", or "defendant"; Daveon Gilmore will be referred to as "Daveon"; and Davon Gilmore will be referred to as "Davon". Daveon and Davon may be referred to jointly as the "Gilmores".

*Facts*

Dechelle Fradieu testified that on the morning of February 21, 2022, she was waiting for the school bus at the bus stop located at Montgomery and Betty Streets in Marrero, Louisiana. She stated that the bus typically arrived between 7:40 a.m. and 7:50 a.m. She was sitting in a car with her sister near the bus stop when she saw the victim, Ahmad Howard, walking from his house towards the school bus stop. As she was about to get out of the car, she witnessed two individuals run from behind a nearby house and immediately begin shooting at Ahmad. The shooters were dressed in all black and wearing masks that only showed their eyes.

Ms. Fradieu testified that she observed both shooters firing guns. They were at least an arm's length away from Ahmad when they began shooting. After Ahmad fell to the ground, the shooters continued to fire at him for a minute or two while standing over him before they left. She said that she could not see the faces of the shooters and could not identify any specific physical characteristics, such as height or weight. She stated that they were in all black clothes. She did not see anyone wearing blue or gray clothes. She confirmed that Ahmad was wearing a black hoodie. Ms. Fradieu did not recognize the shooters and had never seen them before.

Deputy Gavin Martin, a patrol deputy with the Jefferson Parish Sheriff's Office ("JPSO"), testified that he responded to a crime scene dispatch on Betty St. in February 2022. He was one of two or three deputies who responded at around the same time. The initial dispatch signal was for an aggravated battery by shooting, which was later changed to a homicide. Upon arrival, Dep. Martin observed a young Black male lying on the sidewalk with multiple gunshot wounds and no signs of life. He secured the scene by instructing bystanders to get back, and then canvassed the area for evidence. He found numerous shell casings around the victim's body. He learned that the shell casings were from a rifle, which was

important for other officers to know so they would be careful when approaching the suspects. Dep. Martin wore a body camera during the incident. This footage was introduced into evidence. His role included preserving the crime scene and marking evidence, such as shell casings, to prevent tampering.

Dep. Martin testified that multiple witnesses reported seeing three Black males in black hoodies and masks fleeing towards the canal behind Mansfield Dr. He relayed this information over dispatch. He heard over the radio that other officers had seen three Black males with black hoodies running on the canal bank near Mansfield. He said he later learned that the suspects got into a burgundy Dodge van somewhere nearby in the neighborhood.

Daphne Zeno testified reluctantly at the trial that she was sitting in her driveway in a vehicle facing Michael St. when she saw "[t]wo, three. I don't really remember" people get into a van. When asked what she had said after the incident, she stated that she did not remember telling the police that she saw three people running and then getting into a burgundy van. When a bodycam video from after the incident was played, she acknowledged that at the time of the incident, she told the police that she had seen three suspects get into a burgundy Dodge van.

Sergeant Colin Dunning with the JPSO also responded to the crime scene. He testified that as he approached the scene, he was on a phone call with Dep. Martin, another arriving deputy. He saw the victim with several gunshot wounds to the head and torso area. He said that it was immediately apparent that the victim was dead. He testified that he began canvassing the area for suspects. He drove his unit on Mansfield Dr., and then started to search outside of his vehicle. One of his partners looked to the west and saw three people running, so he began to chase them. He ran across a field, and came to Michael St. The three individuals each had something in their hands. He stated that he could not identify what exactly was in their hands, but one item appeared to be a large object that was consistent

with a rifle. As he chased them, his body camera was activated when he unholstered his firearm. He explained that he unholstered his firearm because a 15-year-old kid had just been shot and he saw three males running with objects in their hands. He testified that a woman who was in her vehicle told him that the suspects had entered a burgundy Dodge van. The suspects were wearing dark clothing. He relayed this information over his radio.

Sondriell Williams is Orlando's mother. She testified that at the time of the homicide, she was living in Biloxi, Mississippi. But on the Friday before Monday, February 21, 2022, she drove Orlando to Louisiana to attend the funeral of Ja'Marian Price. That Friday, she dropped Orlando off at the Westwego home of Davon and Daveon, who are twins. Ms. Williams testified that she had arranged to pick up Orlando and the twins on Monday, February 21, to attend the funeral. That Monday morning, Orlando texted her to come pick him up first, before she picked up her other son, Orlandon. She then received a call from Daveon asking what was taking so long. She went to Mansfield St. to pick them up, but did not see them. She then picked them up on Michael St. They seemed to be in a hurry when they got into her Dodge Caravan. The twins sat in the middle bucket seats behind her, while Orlando sat in the back (third row). The front passenger seat next to her was empty. Ms. Williams recalled that Orlando was wearing a black jacket, but she did not remember if the others were wearing jackets. She denied owning any firearms or having knowledge of guns that were found in her vehicle, including one that was later found in a DoorDash bag.

Ms. Williams testified that she then went to a gas station, where she was stopped by the police, who questioned her about the passengers in her vehicle. She stated that defendants were wearing matching shirts because they were going to be pallbearers at Ja'Marian Price's funeral. She confirmed that her son was 17 years old at this time, while the twins were 18 years old.

Deputy David Johnson with the JPSO testified that on February 21, 2022, he participated in an investigation related to a homicide that occurred near Betty St. and Montgomery St. He testified that he became involved after a BOLO (Be On the Lookout) was issued for a burgundy or maroon Dodge Caravan. He observed the suspect vehicle traveling south on Destrehan Blvd. and making a right turn on Lapalco Blvd. He said that he did not activate his lights and sirens at that point because he was waiting for additional units to arrive. Instead, he followed the van into a gas station on Lapalco Blvd., where it pulled up to a gas pump. At that point, a Black female driver from the van approached his vehicle. He then exited his vehicle as the driver asked him "how can I help you?" He told her that her vehicle matched the description of a vehicle involved in an ongoing investigation. His initial contact with the female was not recorded on his body camera.

Dep. Johnson testified that when a second deputy, Brandon Savage, arrived at the scene, they approached the van and observed three Black males inside. He stated that he noticed that they were sweating, and had mud on their shoes. He testified that he saw the barrel of a rifle-style firearm protruding from under a black jacket on the rear passenger's side on the third row. At that point, he pulled everyone out of the vehicle, detained everyone, and locked down the vehicle. Other deputies and supervisors arrived. He turned the vehicle over to the investigators. He spoke with one of the males from the van, who told him that they were on their way to a funeral. This contact was recorded on his body camera.

Detective Scott Bradley works in the homicide section of the JPSO. He arrived at the crime scene and recovered casings that were located on the ground near the victim.

Detective Steven Keller was assigned as the lead detective for JPSO's investigation. On the morning of the homicide, Det. Keller was off duty but on call from 6:00 a.m. to 10:00 a.m. He was notified by his sergeant about a homicide

that occurred in the 1800 block of Betty St. in the Betty Street Projects in Marrero. He responded to work immediately. On the way to the scene, he received information from deputies on the scene, including details from a 911 caller reporting that a child was on the ground and three suspects were running westbound from Betty St. towards Mansfield. The responding deputies were coordinating their response to make an apprehension. Information about the suspects was being relayed by dispatch as described by the 911 callers. The first description was that there were three males, all wearing black hoodies that were seen running from the crime scene westbound towards Julia St. This was updated that the suspects were running towards Mansfield. The suspects were described as wearing black hoodies and possibly a uniform or some type of uniform pants as described by one of the 911 callers.

Deputy Colin Dunning, one of the responding deputies who was chasing the suspects, observed the suspects running westbound along the canal, which was an open field of grass and mud. Dep. Dunning advised dispatch that he and Deputy Breaux saw three males running along the canal bank. Meanwhile, a deputy at the crime scene reported finding rifle casings, which was broadcast to the deputies who were on foot for the deputies' safety.

Dep. Keller testified that Dep. Dunning ultimately ended up on Michael St., where he was advised by a witness, Daphne Zeno, that the three males were picked up by a burgundy Dodge van. Shortly after that, a van fitting this description was stopped by Dep. Johnson.

During the investigation, Dep. Keller spoke with Harson White, who advised that he heard gunshots, as he peered out of his window on Julie St., which was in the vicinity of where the victim was found. Mr. White told him that he saw a Black male in all black clothing with gloves on run past the back of his house. Mr. White told him that as he (Mr. White) moved forward in his house and as he

24-KA-550                                     6

exited, he saw two additional males running in front of his house towards the canal bank. Det. Keller attempted to locate Mr. White so he could be subpoenaed for trial, but was unable to locate him.

Det. Keller spoke with Orlando's mother, Ms. Williams, at the Investigation Bureau after she was detained. Ms. Williams told him that she had dropped Orlando off two days before at Daveon and Davon's home. She told him that on the date she was detained, they were going to attend the funeral of Ja'Marian Price, a friend of defendants. She told him that she was preparing to pick her son up to attend the funeral when, shortly after 7:35 a.m. or so, she received a text or call from her son asking to be picked up on Mansfield. She ultimately received several additional text messages or calls directing her to Mansfield. She told him that once she arrived in the area, she received an additional call from one of the twins asking to be picked up on Carmadel, which was one block west. When Ms. Williams arrived in the area, she observed police activity. She told Det. Keller that she located her son and the Gilmores on Michael St., where they all got in her vehicle in a hurry, and she drove away. She described to Det. Keller that they were out of breath and were wearing jackets, but she did not see anything else. She further told him that from the time she picked up Orlando and the Gilmores, until the time she stopped, no one else got in or out of her vehicle. Once the vehicle stopped, defendants were detained.

The van was towed to the crime lab. Sergeant Keith Dowling with the JPSO homicide division testified that at the request of the lead detective, Det. Keller, he obtained a search warrant for the van. He executed the search warrant and seized several items from the van, including cell phones, weapons, and clothing. The location of the items corresponded to where everyone had been seated. He testified that Det. Keller told him where everyone had been seated based on Det. Keller's investigation in reviewing the bodycam footage and speaking with the

deputies who had made the stop. Sergeant Dowling identified a diagram he prepared showing where each defendant and the driver were seated in the van, as well as the location of the firearms, cell phones, and clothing.

Sergeant Dowling explained that clothing was found under the front passenger's seat in front of the second-row passenger's seat. He also found at that spot a black ski mask with a picture of a rifle and a rose embroidered on it. He further stated that there was a pair of gray pants with dirt or mud on them seized from that area. He also recognized a black shirt seized from the van.

Sergeant Dowling testified that clothes were also found next to the Tegra AR-15 rifle that was tucked between the sidewall of the van and the third-row rear seat. He identified those clothes as black sweatpants that were inside out, a black jacket, a black hooded sweatshirt with dirt or mud on it. Sergeant Dowling also stated that in the rear trunk area of the van, he located a black memorial sweatshirt of a homicide victim, Ja'Marian Price, which had his picture printed on the front and the back.

Det. Keller testified that Davon had been seated on the second row behind the driver; Daveon had been seated on the second-row passenger's side; and Orlando had been seated on the third-row bench seat in the back of the van. Det. Keller said that a fully loaded 9 mm Smith and Wesson M&P firearm was located in the netting of the back of the driver's seat directly in front of where Davon had been seated. He testified that a Glock firearm was found inside a red DoorDash delivery bag tucked between the center console and the front passenger seat located in the vicinity where Daveon had been seated. Det. Keller stated that a Tegra AR-15 rifle was tucked along the seat and the side of the van near where Orlando had been seated. He stated that Ms. Williams had told him that she did not own any firearms and that she had no knowledge of any guns in the van.

Det. Keller testified that firearms examiners later compared the casings found at the crime scene to the firearms found in the van and determined that the Glock and the rifle were a ballistics match to the casings found at the crime scene. He further testified that the crime lab tested the firearms that were involved with the homicide for DNA matches. He learned from the lab that the DNA of all three defendants was found on both murder weapons.

Det. Keller testified that as the investigation moved forward, he learned that Ja'Marian Price, the victim in another case, had been shot and killed earlier on February 12, 2022. This was only nine days before Ahmad Howard, the victim in this case, was killed. He also learned that Derrick Harry, an acquaintance of Ahmad Howard's brother, Allen, had been arrested for the killing of Ja'Marian Price. Det. Keller testified that while no connection could be found between Ahmad Howard and Ja'Marian Price, the evidence suggested that the defendants chose Ahmad because he was the innocent brother of Allen.

Detective Dustin Ducote, employed with the JPSO in the digital forensics unit, testified that he obtained a search warrant for the four cell phones possessed by the three defendants and Sondriell Williams and extracted the contents of the phones.

Det. Keller testified that as part of the investigation and pursuant to the execution of the search warrants, the JPSO was able to review the information extracted from the four cell phones that were found inside of Ms. Williams' van. He testified that he prepared a timeline of events regarding the homicide of Ahmad Howard, which was admitted into evidence. Part of that timeline included excerpts from a group thread that was recovered from the cell phones of Orlando and Daveon. A text dated February 16, 2022 at 7:44 a.m., five days before Ahmad Howard's homicide, from Daveon to Orlando, stated, "im on Allen ass too boy Nobapp." Detective Keller explained that "Allen" was the victim's brother. A few

seconds later, Daveon texted to Orlando, "Y'all kno his momma stay Ina jets Ina back." Det. Keller stated that "jets" referred to the Betty Street Projects.

Det. Keller further testified that the group thread further included texts from later in the evening of February 16, 2022, in which someone named "Mitch" sent a text to Orlando, "We could fuck over his brudda Yk he ride the project bus." Det. Keller explained that the project bus was the school bus that arrived in the Marrero projects to transport the children to school. A few seconds later, "Mitch" texted Orlando, "Fat amahad." The victim's name was Ahmad. On that same date three minutes later, Daveon texted Orlando, "I been saying that!!!" A few seconds later, Daveon texted "about ahmad." "Mitch" thereafter texted to Orlando, "He innocent as a mf too but I ain't doing no tripping." "Mitch" then texted to Orlando, "Getting off the bus." A few seconds later, "Mitch" texted, "But he be staying after school for football practice." A few minutes later, "Mitch" texted, "I forgot all about the morning."

Det. Keller testified that the group thread continued when about a minute later, Orlando texted the group, "yk I love them bus stops." The next day, on February 17, 2022, Daveon texted Orlando, "Wat time the bus come for?," and "Mitch" responded, "7:37." Later that night, Daveon texted the group, "fatt got the smitty." Detective Keller testified that "fatt" was Davon and that "smitty" was a Smith and Wesson firearm.

The homicide of Ahmad Howard occurred four days later on February 21, 2022, at approximately 7:36 a.m., near the bus stop. According to the testimony of Det. Keller, the first 911 call came at 7:36 a.m.

The texting on the group thread that was recovered from the cell phones of Orlando and Daveon continued after the homicide. Det. Keller testified that the next text was on February 21, 2022 at 7:44 a.m., when an individual identified as "Thugga" texted, "Project hot hot." Det. Keller explained that this meant police

activity referencing the homicide that had just occurred. He stated that at 7:51 a.m., Daveon responded to the group text with three laughing emojis. Daveon responded again to the group thread at 8:05 a.m., "Police behind us, stop adding me."

Det. Keller testified that the phone extraction of Davon's phone located a video taken on February 20, 2022, the day before the homicide. He identified Daveon, Davon, and Orlando in this video. He testified that in this video, Orlando was holding the Tegra AR-15 firearm that was recovered from the van the next day after the homicide. He also testified that there was a firearm in Davon's hand. He further identified that in the video, Daveon was wearing the black hooded sweatshirt that was retrieved from the van after the homicide.

Det. Keller testified that on the morning of the homicide, February 21, 2022, at 6:53 a.m., Orlando's phone connected to Uber and logged his travel from Fourth St. to the 1800 block of Julie St., one block west from Betty St., where he arrived at 7:16 a.m., about twenty minutes before the homicide. This was in the vicinity of where Ahmad Howard was killed. He further testified that Davon's cell phone also showed that he was in that area at 7:16 a.m.

Det. Keller stated that a video was extracted from Daveon's cell phone and that the file was created on the day of the homicide, February 21, 2022, at 7:22 a.m., approximately fourteen minutes prior to the homicide. He testified that the video depicted Davon, Daveon, and Orlando with a background that was consistent with the housing structures on Betty St. Further, some of the clothing that defendants were wearing in the video was recovered from the van after it was stopped. He pointed out that the three defendants wore masks in the video and that Daveon and Orlando's masks were later found in the van.

Det. Keller testified that he is familiar with different associates or known members of gangs in this area, and that gang activity or neighborhood feuds play a

part in homicide investigations and retaliation-type murders. He testified that through intelligence gathered over an extended period of time by a multitude of detectives, it was known that Ja'Marian Price was associated with a gang known as BSY, which stands for "Betty Street Youngins." He testified that defendants are known associates of BSY. Det. Keller located rap videos that had been uploaded to YouTube that included Orlando and his co-defendants and referenced BSY. The rap videos and still photos derived from the videos were published to the jury.

Det. Keller testified that the first video, the "BSY Girls Betty Talk," was uploaded to YouTube in 2019. He said "[t]hrowing up them B's" means representing Betty Street. A photograph shown during the video is a memorial shirt depicting "Little Eric" and in the lower left portion of the picture, it says Betty Street Youngin. Each of the defendants appear in this video. The "Betty Street" sign in the video is a few blocks from the scene where Ahmad Howard was killed.

Det. Keller testified that the second video, "BSY TShots", was recorded in the Betty Street Project in a playground in a closer area towards Lapalco Blvd. on Betty St., and in proximity to where the homicide occurred. This video was uploaded to YouTube in 2021, about six to eight months before Ahmad Howard was killed. Lyrics sung in the recorded song refer to wearing a mask so they can "beat a case" (although a case involving a crime cannot be identified). Det. Keller testified about a still photo from this video that shows Daveon and Orlando making a "B" gesture with their hands, which stands for "Betty Street."

The third YouTube video, "Project Baby Ruga", includes Orlando as one of the main rappers. Det. Keller testified that this video was uploaded to YouTube between June and August of 2021, about six months before the death of Ahmad Howard. In the video, Orlando raps, "I keep a stick on me." Det. Keller testified that the word "stick" means "rifle." Daveon is also on this video and says, "I don't

believe in justice so revenge makes me get angry," while Davon says, "dead bodies on the scene, line them up with that chalk." Det. Keller testified that in a photo extracted from Davon's cell phone, Davon appears to be wearing the same outfit as in the "Project Baby Ruga" video. This photo is time-stamped December 23, 2021.

Dr. Dana Troxclair, an expert in forensic pathology, testified that she performed the autopsy on the victim, who was sixteen years old. She testified that the victim sustained nine gunshot wounds and six exit wounds. Dr. Troxclair explained that there were three fatal shots: one to the back of the head that went through his brain, one that went through his lung, and one that went through his epiglottis and larynx. She pointed out that she recovered three projectiles and copper fragments during the autopsy. She stated that (1) a projectile was found in the right elbow; (2) a projectile and a fragment of copper were recovered from the posterior scalp; (3) fragments were recovered from under the right arm; and (4) a projectile was recovered from his right pelvis. Dr. Troxclair testified that the cause of death was multiple gunshot wounds and the manner of death was homicide.

Jene Rauch, an expert in firearm and toolmark identification and analysis, testified that she received numerous casings, projectiles, and fragments from the crime scene. She testified that she compared three of the casings to the Tegra rifle, and determined that the three casings were fired from the Tegra rifle. She also testified that she received two other casings, which she compared to the Glock pistol. She determined that those two casings were fired from the Glock firearm. She testified that she received projectiles or fragments from the autopsy, and determined that projectiles for the scalp, elbow, and pelvis area were fired from the Tegra rifle. She pointed out that none of the casings or projectiles matched the Smith and Wesson pistol.

Adriana Perez Washington, a senior DNA analyst with the JPSO, was qualified as an expert in the area of DNA analysis. Her testimony focused on the DNA analysis of clothing and firearms found at the crime scene, and identifying potential contributors to the DNA profiles found on these items. She identified several items of clothing for DNA analysis, including (1) a black sweatshirt, (2) a black jacket, (3) a pair of black sweatpants, (4) a blue mask, (5) a black ski mask, and (6) a pair of gray pants.

Ms. Washington concluded that the black sweatshirt had insufficient DNA to produce a valid profile. The DNA profile from the black jacket indicated a mixture from four contributors, with Orlando being a likely contributor. The DNA profile from the black sweatpants showed a DNA mixture from three contributors, with strong support for Orlando as a contributor. The blue mask had DNA from three contributors, with strong support for both Orlando and Daveon as contributors. Due to the complexity of the mixture of DNA on the black ski mask, Ms. Washington was unable to interpret whose DNA was on the black ski mask. The gray pants had a DNA mixture from four contributors, with strong support for Daveon as a contributor.

Ms. Washington stated that as to the weapons found at the crime scene, swabs from the grip of the Tegra model AR-15 pistol showed a DNA mixture from three contributors, with strong support for Orlando as the primary contributor. The Glock pistol also had a DNA mixture from three contributors with Daveon being a contributor, and also with Orlando as a contributor. The Smith & Wesson 9 mm pistol had insufficient DNA for her to produce a valid profile.

*Law and Analysis*

Orlando raises two assignments of error on appeal. He first argues that the trial court erred in denying the motion to sever defendants for trial, and second that the trial court erred in admitting evidence of other bad acts.

24-KA-550                                     14

A. *First Assignment of Error – Denial of Motion to Sever*

1. *Procedural History on Defendants' Motions to Sever*

On July 17, 2024, Davon filed the first motion to sever for trial among the three defendants, arguing that they would be presenting antagonistic defenses at a joint trial. Davon argued, *inter alia*, that he would be forced to blame the other defendants at trial in order to exonerate himself, and therefore, those defendants would have to defend themselves from the State and from Davon.

At the hearing on July 22, 2024, the State argued that there were no antagonistic defenses. The State asserted that when the three defendants were arrested, none of them gave statements or pointed the finger at the other. The State argued that they were all involved in the offense. The trial court denied Davon's motion to sever, finding that Davon failed to carry his burden.

On August 8, 2024, Orlando filed a motion to sever defendants, and specifically moved for a trial separate from Davon. Orlando argued that in Davon's motion to sever, Davon indicated that he would be blaming the co-defendants, thus forcing the co-defendants to defend against Davon and the State. Orlando argued that a severance was justified because the defenses were antagonistic. The trial court denied the motion.

On August 9, 2024, Davon filed a writ application with this Court challenging the trial court's denial of his motion to sever. This Court denied the writ on August 15, 2024, and cited the Louisiana Supreme Court case of *State v. Prudholm*, 446 So.2d. 729, 741 (La. 1984), which held that "the mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance." *State v. Davon Gilmore*, 24-363 (La. App. 5 Cir. 8/15/24), 2024 WL 3823431, *writ denied, stay denied,* 24-1034 (La. 8/17/24), 390 So.3d 1289. This Court found that because the transcript from the July 22, 2024 hearing was not

attached to the writ application, this Court could not adequately review whether the trial court abused its discretion in denying Davon's motion to sever. *Id.*

Also on August 15, 2024, Daveon's trial counsel filed a motion to sever defendant for trial for the same reasons cited by Davon in Davon's motion to sever. The trial judge denied Daveon's motion to sever as moot for the reasons stated at the hearing on July 22, 2024.

On August 22, 2024, after the jury was selected but before opening statements, Orlando and Daveon re-urged their motions to sever defendants for trial. The trial court denied the re-urged motions to sever.

During the opening statement, Davon's counsel stated, "[t]he evidence in this case will show that Orlando Washington and Daveon Gilmore committed the second degree murder of Ahmad Howard." Daveon objected to the shifting of blame to the other defendants and argued for separate trials. Orlando objected to him being accused of a crime by someone who could not be cross-examined in front of the jury. The trial court overruled the objections, stating that "Mr. [Davon] Gilmore is entitled to present a defense. And if his defense is that he is less culpable or not culpable, then he is entitled to do so."

2. *Analysis - Motion to Sever*

Orlando argues that the trial court erred in denying his motion to sever defendants for trial because Davon's defense was that Orlando and Daveon were the shooters who committed the murder, and that Davon was not involved. Orlando contends that the trial court denied him a fair trial by forcing him to defend himself against both the State and Davon. He argues that the trial court abused its discretion by failing to acknowledge the antagonistic defenses.

The State responds that Orlando failed to establish any prejudice resulting from the denial of his motion to sever. It further responds that the trial court acted within its discretion in denying the motion as Orlando did not demonstrate that the

joint trial caused antagonistic defenses or introduced evidence that would have been inadmissible in a separate trial. The State submits that none of the defendants testified, and that only Daveon introduced any evidence at the trial, which consisted of five photographic demonstrative exhibits that did not implicate Orlando.

La. C.Cr.P. art. 704 provides the following regarding severance:

Jointly indicted defendants shall be tried jointly unless:

(1) The state elects to try them separately; or

(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.

Whether justice requires a severance must be determined by the facts of each case. *State v. Molette*, 17-697 (La. App. 5 Cir. 10/17/18), 258 So.3d 1081, 1089, *writ denied*, 18-1955 (La. 4/22/19), 268 So.3d 304. A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. *Id.* at 1091. A denial of a motion to sever will not be overturned absent a clear abuse of discretion. *Id.*

A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State. *State v. Hicks*, 17-696 (La. App. 5 Cir. 10/17/18), 258 So.3d 1039, 1049, *writ denied*, 18-1938 (La. 4/15/19), 267 So.3d 1123. The defendant bears the burden of proof in a motion to sever. *State v. Coe*, 09-1012 (La. App. 5 Cir. 5/11/10), 40 So.3d 293, 301, *writ denied*, 10-1245 (La. 12/17/10), 51 So.3d 17. The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. *Hicks*, 258 So.3d at 1049. Prejudice must be shown if defendants are to receive separate trials. *State v. Williams*, 16-417 (La. App. 5 Cir. 8/30/17), 227 So.3d 371, 394-95, *writ denied*, 17-1663 (La. 9/14/18), 252 So.3d 483. Prejudice

may occur in a joint trial "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.*

Justice does not require severance where only the extent of participation of each defendant is at issue. *State v. Duckett*, 12-578 (La. App. 5 Cir. 5/16/13), 119 So.3d 168, 177, *writ denied*, 13-1383 (La. 1/17/14), 130 So.3d 340. However, when the ends of justice will be best served by severance, it should be granted. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 476, *writ denied sub nom. State ex rel. Massey v. State*, 12-991 (La. 9/21/12), 98 So.3d 332.

When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be. *Williams*, 227 So.3d at 394 n.42. After trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence that has actually been admitted.

In reviewing a pretrial motion for severance, the Louisiana Supreme Court has held that "[i]t is incumbent upon us to review the validity of the ruling without regard to whether at trial substantial other evidence was introduced or whether his conviction would have been a certainty irrespective of the joint trial." *State v. Lavigne*, 412 So.2d 993, 997 (La. 1982). In *Duckett*, 119 So.3d at 178, this Court recognized that:

> If the motion to sever is not made until after the trial commences, the conviction will not be reversed for its denial even if a severance was warranted unless the court finds the defendant 'would probably not have been convicted' at a separate trial. If the motion is made pretrial and denied, the appellate court may not consider the weight of the evidence or the certainty of the defendant's conviction in a separate trial in assessing the validity of the trial court's ruling.

In the present case, this Court considers the trial court's ruling on Orlando's pretrial motion to sever, and the motion to sever that he made after the trial began. Orlando did not offer evidence in support of his pretrial motion for severance.

Instead, he made only general arguments that the defenses he would present at trial would be antagonistic with the other defendants. Orlando's unsupported allegations were insufficient to require a severance.

At the July 22, 2024 hearing on Davon's motion to sever, the State represented that none of the defendants gave statements to the police after the homicide of Ahmad Howard. Based on the State's representations at that hearing, it appeared that all three defendants were involved in the offense. Davon's motion to sever acknowledged that witnesses saw three people flee the scene. Justice does not require severance when only the extent of participation of each defendant is at issue. *See Duckett*, 119 So.3d at 177. Further, Orlando failed to demonstrate that his co-defendants would testify at a separate trial or that their testimony would exculpate him. The State also indicated at the July 22, 2024 hearing that there would be evidence admitted at trial showing that all three defendants were members of the BSY gang. Therefore, it appears that this evidence would have been admissible whether the defendants were tried jointly or separately.

We conclude that Orlando's first assignment of error is without merit. The district court did not abuse its discretion by denying Orlando's motions to sever defendants for trial.

B. *Second Assignment of Error – Admitting Evidence of Other Bad Acts*

    1. *Procedural History*

Orlando's second assignment of error asserts that the trial court erred in admitting evidence of "other bad acts," namely, three rap videos that had been uploaded to YouTube, because the videos were not relevant to the crime charged and only served to paint Orlando in a bad light by suggesting that he was a member of a gang.

The State responds that the trial court did not abuse its discretion in admitting the videos. It asserts that the victim was killed in retaliation for the

murder of Ja'Marian Price, a member of the BSY gang, nine days previously. The State argues that the videos showed that Orlando and his co-defendants were also associates of the BSY gang, and therefore, the videos were admissible and relevant for narrative completeness and to show motive and intent. Alternatively, the State argues that any error in the admission of the videos was harmless as the other evidence overwhelming established beyond a reasonable doubt that Orlando was guilty of second degree murder.

On May 8, 2024, the State filed a Notice of Intent to Introduce Evidence as Res Gestae or in the Alternative Under La. C.E. Article 404(B) (the "404(B) motion"). The notice stated that the three defendants were charged with second degree murder, and that the State intended to introduce evidence of them being members or associated with a group/gang known as the "Betty Street Youngins" (BSY) before and during the moments leading up to the murder. The State indicated that it intended to introduce this evidence through text messages, witness testimony, and rap videos. Further, the notice stated that the State intended to introduce evidence that the murder was a gang retaliation murder for the killing of Ja'Marian Price, a member of BSY, that occurred nine days previously.

Davon filed an opposition to the State's notice of intent, arguing that the State should not be allowed to introduce evidence of *res gestae*/other alleged crime or bad acts because (1) the evidence was not *res gestae*; (2) the State had not met its burden under La. C.E. art. 404(B); (3) the State failed to establish that the alleged prior bad act was at issue as to Davon; and (4) the evidence was more prejudicial than probative. Orlando and Daveon adopted these arguments.

On July 11, 2024, the trial court held a hearing on the 404(B) motion, and ruled that the rap videos were admissible as *res gestae* evidence for purposes of narrative completeness, and by providing context to the events. The trial court further found that the evidence was admissible under La. C.E. 404(B), which

allows for introduction of evidence to establish motive, intent, preparation, plan, knowledge, and identity. The trial court conducted the balancing test provided for in La. C.E. art. 403, and concluded that the evidence was relevant and that its probative value was not outweighed by the danger of unfair prejudice to defendants.

Defendants each sought supervisory review of the trial court's July 11, 2024 decision. Orlando filed a notice of intent to file writ application on August 2, 2024. This Court denied Orlando's writ application on August 15, 2024, finding that it was deficient because it failed to include a transcript of the hearing, the three exhibits admitted at the hearing, and a copy of the State's Notice of Intent to Introduce Evidence as Res Gestae or in the Alternative under La. C.E. Article 404(B). *State v. Washington*, 24-351 (La. App. 5 Cir. 8/15/24), 2024 WL 3823427.[2]

During the trial, Detective Keller testified that Ja'Marian Price, Orlando, and his co-defendants were known associates of "BSY," which stands for "Betty Street Youngins." He further testified that the YouTube videos were evidence referencing Orlando and his co-defendants' association with BSY.

At the trial, the trial court gave defendants an opportunity to pose additional questions to Detective Keller out of the presence of the jury and to re-urge their objections to the YouTube videos. The trial court subsequently found that the

---

[2] This Court initially granted in part and denied in part Daveon's application for supervisory review, finding that the trial court did not abuse its discretion by ruling that two of the three rap videos were admissible at trial as 404(B) and *res gestae* evidence. *State v. Daveon Gilmore*, 24-368 (La. App. 5 Cir. 8/15/24), 2024 WL 3823436, *vacated in part on reh'g,* 24-368 (La. App. 5 Cir. 8/16/24), and *writ denied, stay denied,* 24-1035 (La. 8/17/24), 390 So. 3d 1289.

The State sought rehearing of the ruling as to Video 1. On rehearing, this Court vacated the August 15, 2024 ruling to the extent that it granted Daveon's writ as to Video 1. *State v. Daveon Gilmore*, No. 24-368 (La. App. 5 Cir. 8/16/24), 2024 WL 3863550. We recognized "the State's obligation to adhere to the rules of evidence in its offer of 404(B) and *res gestae* evidence at trial." *Id.* at *1-2.

State laid a proper foundation with regard to authentication of the videos, and admitted them into evidence.

### 2. *Analysis*

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Thomas*, 19-582 (La. App. 5 Cir. 7/29/20), 300 So.3d 517, 526, *writ denied,* 20-1503 (La. 3/2/21), 311 So.3d 1053. Generally, a court may not admit evidence of other crimes to show a defendant is a person of bad character, and that he has acted in conformity with his bad character. *State v. Maize*, 16-575 (La. App. 5 Cir. 6/15/17), 223 So.3d 633, 648, *writ denied,* 17-1265 (La. 4/27/18), 241 So.3d 306. However, the State may introduce evidence of other crimes, wrongs, or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. *Id.*; La. C.E. art. 404 B(1). Such evidence is also admissible when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. *Id*.

*Res gestae* events of other crimes or acts are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *State v. Rodney*, 19-195 (La. App. 5 Cir. 10/23/19), 282 So.3d 395, 403; *Maize*, 223 So.3d at 648. The *res gestae* doctrine is designed to allow the story of the crime to be told in its entirety by proving its immediate context of happenings in time and place. *Rodney*, 282 So.3d at 403. Close connexity in time and location is required between the charged and uncharged conduct to ensure that "the purpose served by admission of the other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *State v. Smith*, 23-263 (La. App. 5 Cir.

12/27/23), 379 So.3d 206, 212. The test of whether *res gestae* evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. *Id.*

Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *State v. Frickey*, 22-261 (La. App. 5 Cir. 3/1/23), 360 So.3d 19, 50, *writ denied*, 23-468 (La. 11/8/23), 373 So.3d 59. Additionally, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403; *State v. Shorter*, 23-128 (La. App. 5 Cir. 11/29/23), 377 So.3d 421, 436, *writ denied*, 23-1669 (La. 5/29/24), 385 So.3d 704.

Orlando objects to the admissibility of the three rap videos that were found on YouTube, arguing that the videos had no connection to the shooting of Ahmad Howard, and that the only purpose is to paint Orlando as a dangerous gun-carrying gang member. He asserts that the videos were all rap music videos that were created by teenagers, and there is no evidence that anything in the videos had any basis in reality, or were anything more than a creative expression by teenagers wanting to be rap artists. He claims that because there was no connection between the videos and the crime alleged, the probative value of the videos is outweighed by their prejudicial effect. Thus, he argues that it was reversible error for the trial court to allow their admission at trial.

We disagree and find that the trial court did not abuse its discretion in admitting the rap videos. The State's theory of the case was that Orlando and his two co-defendants planned the killing of Ahmad Howard in retaliation for the murder of Ja'Marian Price. The purpose of the videos was to show that defendants

were associates of BSY and to show that they were connected to Ja'Marian Price, also an associate of BSY. The State asserted that it was Orlando and the two co-defendants' connection to Ja'Marian Price that was the basis for the retaliation killing of Ahmad Howard. The videos were necessary for narrative completeness or the State's case would arguably have lost its narrative momentum. The videos provided context as to how the defendants knew each other and Ja'Marian Price. As such, the videos were admissible under Article 404(B) to prove motive, intent, knowledge and/or identity. And as previously noted, this Court already found that the trial court did not abuse its discretion by ruling that the three rap videos were admissible at trial under Article 404(B) and as *res gestae* evidence. *See State v. Daveon Gilmore*, 24-368 (La. App. 5 Cir. 8/15/24), 2024 WL 3863550.

Further, even if the trial court erred in admitting this evidence, any error was harmless considering the other overwhelming evidence against Orlando. An improper reference to other crimes evidence is subject to a harmless error analysis. *Frickey*, 360 So.3d at 50; *State v. Nelson*, 02-65 (La. App. 5 Cir. 6/26/02), 822 So.2d 796, 804–05, *writ denied,* 02-2090 (La. 2/21/03), 837 So.2d 627.

The evidence in this case showed that two males shot Ahmad Howard while he was walking to the bus stop, after which three Black males wearing black hoodies and masks and carrying guns ran from the scene and entered a burgundy Dodge van driven by Orlando's mother. The Dodge van was stopped shortly thereafter. The three defendants were seated inside the van, with a Tegra rifle located near Orlando, a Glock pistol located near Daveon, and a Smith and Wesson 9 mm pistol located near Davon. Casings from the Tegra rifle and the Glock pistol were found near Ahmad Howard at the crime scene. The State's expert firearms examiner, Jene Rauch, compared the casings found at the crime scene to the firearms found in the van and determined that they were a ballistics match to the casings found at the crime scene. Ms. Rauch also examined projectiles or

fragments from the autopsy and determined that projectiles for the scalp, elbow, and pelvis area were fired from the Tegra rifle, which was located where Orlando was sitting in the van. Additionally, Adriana Perez Washington, a senior DNA analyst, testified that Orlando's DNA was on the Tegra rifle, and Daveon's DNA was on the Glock.

Orlando's mother, Ms. Williams, said that she did not own any firearms and that she had no knowledge of any guns in the van. Deputy Johnson testified that when he looked inside the van, he saw that the three defendants were sweating and that they had mud on their shoes.

The evidence further shows that clothing and two masks were retrieved from the van, with varying degrees of the defendants' DNA found on the clothing, and that the blue mask contained the DNA of both Orlando and Daveon. The evidence established that the three defendants were on their way to the funeral of their friend, Ja'Marian Price, on the morning of the murder, and that a memorial sweatshirt with Ja'Marian Price's photograph on it was found in the van.

Defendants' phones were found in the van. A video extracted from Davon's phone that was taken on February 20, 2022, the day before the homicide, showed Orlando holding the Tegra rifle that was recovered from the van the next day. This video also showed a firearm in Davon's hand, and that Daveon was wearing a black hooded sweatshirt that was retrieved from the van after the homicide.

The extracted contents of defendants' phones included text messages that showed that Orlando and Daveon helped plan the killing and that they targeted the victim.

Further, Orlando's phone showed that on the morning of the homicide, Orlando connected to Uber and arrived near Betty St., in the vicinity of the homicide about twenty minutes before the homicide. And, a video extracted from Daveon's cell phone on the day of the homicide showed that approximately

fourteen minutes before the homicide, the three defendants were together with a background that was consistent with the housing structures on Betty St. Some of the clothing that defendants were wearing in the video was recovered from the van after it was stopped.

In light of this evidence, we conclude that even if the trial court erred in admitting the three rap videos, any error was harmless considering the overwhelming evidence against Orlando.

### Errors Patent Review

We reviewed the record for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). We found no errors patent.

### Decree

For the foregoing reasons, we affirm defendant's conviction and sentence.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 27, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-550

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
R. CHRISTOPHER COX, III (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)      THOMAS J. BUTLER (APPELLEE)      LIEU T. VO CLARK (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053